IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

DERIC LAVELLE MAY,  #209534,        :

    Plaintiff,                        :

vs.                                 : CIVIL ACTION NO. 15-00025-KD-B

KAREN STONE, *et al.*,              :

    Defendants.                       :

### REPORT AND RECOMMENDATION

Deric LaVelle May, an Alabama prison inmate who is proceeding *pro se*, filed the instant § 1983 action, which has been referred to the undersigned pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 72.2(c)(4) for appropriate action. When May filed his Complaint, he also filed a motion to proceed without prepayment of fees.  Because May is a "three-striker," he is required to pay the statutory filing fee at the time of filing, unless he meets the exception to 28 U.S.C. § 1915(g). After reviewing May's Complaint, the undersigned recommends that that this action be dismissed without prejudice pursuant to 28 U.S.C. § 1915(g).

## I.  Applicable Law.

Section 1915(g) provides:

> In no event shall a prisoner bring a civil action or appeal a judgment in a civil action or proceeding under this section [28 U.S.C. § 1915] if the prisoner has, on 3 or more prior occasions, while incarcerated or detained in any facility, brought an action or

appeal in a court of the United States that was dismissed on the grounds that it is frivolous, malicious, or fails to state a claim upon which relief may be granted, unless the prisoner is under imminent danger of serious physical injury.

The purpose of this section is to curb abusive prisoner litigation by requiring a prisoner who has had three actions or appeals dismissed as meritless to pay the full filing fee when his next action is filed. Dupree v. Palmer, 284 F.3d 1234, 1236 (11th Cir. 2002). "The only exception to section 1915(g) is if the frequent filer prisoner is 'under imminent danger of serious physical injury.'" Rivera v. Allin, 144 F.3d 719, 723 (11th Cir. 1998), overruled on other grounds by Jones v. Bock, 549 U.S. 199, 215-16 (2007).

Even though May is known to this Court as a "three-striker," the Court has nevertheless reviewed the records of the United States District Court for the Southern, Middle, and Northern Districts of Alabama to verify that he has three or more in forma pauperis actions or appeals that were dismissed on the grounds that they were frivolous, malicious, or failed to state a claim upon which relief can be granted. From this review, the Court confirmed that May has seven actions and appeals that were dismissed based on one of the foregoing reasons, namely, May v. Culliver, CA 10-0121-CG-C (S.D. Ala. Feb. 24, 2012) (failure to state a claim), appeal dismissed (11th Cir. Sept. 20, 2012) (frivolous); May v. Patterson, CA 12-

0703-KD-N (S.D. Ala. Sept. 5, 2013) (malicious), <u>appeal dismissed</u> (11th Cir. June 4, 2014) (frivolous); <u>May v. Barber</u>, CA 13-0237-CB-C (S.D. Ala. July 22, 2013) (malicious), <u>appeal dismissed</u> (11th Cir. July 24, 2014) (frivolous); <u>May v. Patterson</u>, App. No. 13-14499-C (11th Cir. June 26, 2014) (frivolous) (corresponding district court case is CA 11-0675-KD-B (S.D. Ala. Sept. 9, 2013) (dismissed on defendants' summary judgment motion)).[1]

In order to avoid the dismissal of the present action pursuant to § 1915(g), May must satisfy the exception to § 1915(g), which requires that at the time of the complaint's filing, he show that he was "under imminent danger of serious physical injury." <u>See Adbul-Akabar v. McKelvie</u>, 239 F.3d 307, 315 (3d Cir. 2001) ("By using the term 'imminent,' Congress indicated that it wanted to include a safety valve for the 'three strikes' rule to prevent impending harms, not those harms

---

[1] In addition to these actions and appeals, this Court's docket reflects nine other actions filed by May in addition to another action filed in the Northern District of Alabama.  Based on a review of all May's actions, eight of May's actions contain claims based on medical issues related to his head, namely, <u>May v. Culliver</u>, CA 10-0121-CG-C; <u>May v. Patterson</u>, CA 11-0675-KD-B; <u>May v. Barber</u>, CA 13-0237-CB-C; <u>May v. Barber</u>, CA 13-0429-CB-M; <u>May v. Hetzel</u>, CA 14-0155-CG-C; <u>May v. Thomas</u>, CA 13-0385-CB-M; <u>May v. Barber</u>, CA 14-0479-WS-N; and <u>May v. Andrews</u>, CA 15-30-KD-M (pending).  Furthermore, five of his actions have been dismissed pursuant to 28 U.S.C. § 1915(g), namely, <u>May v. Barber</u>, CA 13-0429-CB-M; <u>May v. Howard</u>, CA 13-0557-CG-C; <u>May v. Smith</u>, CA 14-0171-CG-B; <u>May v. Myers</u>, CA 14-0271-KD-B; <u>May v. Thomas</u>, CA 13-0385-CB-M; and <u>May v. Andrews</u>, CA 15-0030-KD-M.

that had already occurred."), <u>cert. denied</u>, 533 U.S. 953 (2001); <u>Brown v. Johnson</u>, 387 F.3d 1344, 1349 (11th Cir. 2004) ("[A] prisoner must allege a present imminent danger, as opposed to a past danger, to proceed under section 1915(g)"); <u>Medberry v. Butler</u>, 185 F.3d 1189, 1193 (11th Cir. 1999) (ruling that the plaintiff must face imminent danger of serious physical injury at the time the complaint is filed, not at a prior time).

In determining if the exception to § 1915(g) is satisfied, "the issue is whether his complaint, as a whole, alleges imminent danger of serious physical injury." <u>Brown</u>, 387 F.3d at 1350.  To make this showing, a plaintiff "must allege and provide specific fact allegations of ongoing serious physical injury, or a pattern of misconduct evidencing the likelihood of imminent serious physical injury[.]" <u>Ball v. Allen</u>, CA No. 06-0496-CG-M, 2007 U.S. Dist. LEXIS 9706, at *4, 2007 WL 484547 at *1 (S.D. Ala. Feb. 8, 2007) (citation and quotation marks omitted) (unpublished) (Granade, C.J.).  Plaintiff has not done this.

**II. Complaint.**  (Doc. 1).

On January 16, 2015, the Court received May's Complaint, which bears a signature date of January 12, 2015.  (Doc. 1 at 7).  In the complaint, May identifies March 27, 2014, as the date of the complained of incident.  (<u>Id.</u> at 4).  He names as Defendants, Karen Stone, Doctor at Holman Correctional Facility

4

("Holman"); Bennie Andrews, Registered Nurse and Health Services Administrator at Holman; and Gary Hetzel, Warden at Holman. (Id. at 5).  According to May, on January 27, 2014, he had an appointment with Dr. Iliff for frequent and severe headaches. (Id. at 4).  May told Dr. Iliff that his AVMs and shunt issues might be causing him headaches.  (Id.).  Dr. Iliff submitted a request for a CT scan of May's head.  (Id.).

On March 5, 2014, Defendant Dr. Stone met with May to discuss the report of the CT scan of his head taken on February 21, 2014.  (Id.).  In his Complaint, May quotes from the report and takes issue with findings in the report, to-wit:

> The report reveals that (May) has had a cranlotomy in the occiput and there are some scattered clips of what are probable aneurysm type clips scattered about the posterior fossa and this produces flash artifacts.  This study does suggest infarction of a portion of the portion medial right cerebellar hemisphere and a small portion of the left occipital lobe. "There is a VP 'shunt tube' (called ventricular catheter) that enters the right superior occipital bone and goes into the right lateral ventricle.  The ventricle[s] are mild[ly] prominent but not grossly enlarged and the ventricles are fairly symmetrical.  No intracranial bleed or mass effect is seen. There is no study for comparison."  However, this shunt tube is only one part to [his] VP shunt.  The report didn't mention any other parts, such as the reservoir, valve, or distal.  Each VP shunt general[ly] has four parts but [his] VP shunt is a man made artifact and defendant[s] are not in possession of [his] medical record[s] from 1990 when the VP shunt was first placed in [his] ventricle, therefore, the defendants'

> really   lack   knowledge   about   the   object
> therefor, standards of care [are] inadequate.

(Id. at 4, 5, 8) (emphasis in original).

On  March  27,  2014,  May  signed  up  for  sick  call  to  speak

with  Defendant  Dr.  Stone,  because  the  radiologist  did  not

mention  May's  hydrocephalus  in  her  report,  and  to  request  to  be

seen  by  a  neurologist  and  a  neurosurgeon  so  they  could  review

May's  CT  scan.   (Id.  at  8-9).   May  was  not  seen  at  sick  call  but

instead  received  a  written  response  by  Defendant  Dr.  Stone,

which stated:

> I  do  not  need  to  see  you  again  re:  the  matter
> of  a  neurologist  or  neurosurgeon  consult
> related  to  your  shunt.   As  I  explained  to  you
> on  your  CCC  (Chronic  Care  Clinic)  visit  of
> March  5,  2014,  the  CT  of  your  head  of
> February  21,  2014  is  the  same  or  even
> slightly  improved  as  compared  to  the  CT  of
> July  22,  2009.   This  is  my  decision  at  this
> time.

(Id.  at  9).   May  further  alleges  that  on  March  27,  2014,

Defendant  Hetzel  "failed  to  ensure  that  the  defendants  were

adequately  trained,  . . .  to  oversee  them[,]  and  [to]  discipline

them[,]"  but  without  providing  specific  facts  to  support  this

claim  against  a  corrections  official.   (Id.  at  6).

Plaintiff  contends  that  neither  the  CT  scan  of  February  21,

2014  nor  the  CT  scan  of  July  22,  2009  showed  that  his  shunt  is

working  as  it  is  designed  to  work  and  that  Defendant  Dr.  Stone

made  a  decision  that  requires  a  specialist's  attention.   (Id.  at

6

9).   He asserts that Dr. Quindlen noted in his report of July 12, 2010 that Plaintiff's shunt "has collapsed and does not refill."  (Id.).

On April 8, 2014, May filed a grievance complaining that he had signed up for sick call to request to be examined by a neurologist and/or neurosurgeon because hydrocephalus is present.  (Id.).  Defendant Andrews responded "that he had spoken with (Dr. Stone) regarding this complaint. She and I concur that compared to [his] recent CT scan and previous CT scan there had been no change.  This is an indication that the shunt is working."  (Id.).  May maintains that neither his "CT scan of July 22, 2014[sic]" nor the CT scan of February 21, 2014 "reveals that the VP shunt is working as it was designed to work [and that Defendants] (Andrews) and (Stone) made a decision that required a specialist['s] attention."  (Id. at 10).

May also asserts:

> [His] VP shunt was implanted in the right ventricle of his brain to manage the pressure from his hydrocephalus, a very danger[ous] brain condition due to an excessive buildup of cerebro spinal fluid. This excessive buildup of cerebro spinal fluid has caused [him] daily discomforts such as frequent and se[vere] headaches, [his] equilibrium is off, tire[d]ness irritability due to defendant's refuse[al] to ensure [he] received anything to alleviate his pains, and when [he] did not get prescribed something to alleviate his pains it came after lengthy delays because [his] family contacted a

7

> higher   authority.    Defendant[s']   obdurate
> refusal was clearly wanton[n]ess.

(<u>Id.</u>).

May further maintains that the total withdrawal of medical care constituted an "imminent danger of serious physical injury." (<u>Id.</u> at 8).  Moreover, May claims that the "VP shunt has collapsed, does not refill, and can further deteriorate to the extent that it pose[s] an imminent danger of serious physical injury because [his] VP shunt['s] malfunction is left untreated." (<u>Id.</u> at 11).

For relief, May requests punitive and compensatory damages and all costs taxed to the Defendants.  (<u>Id.</u> at 7).

## III.  Analysis.

May's Complaint was filed between January 12, 2015, when he signed the document, and January 16, 2015, when it was received by the Court.  (<u>Id.</u> at 7).  <u>See Houston v. Lack</u>, 487 U.S. 266, 276, 108 S. Ct. 2379, 2385, 101 L. Ed. 2d 245 (1988) (When a prisoner "deliver[s] [a pleading] to the prison authorities for forwarding to the court clerk," it is deemed filed.); <u>see Garvey v. Vaughn</u>, 993 F.2d 776, 783 (11th Cir. 1993) (extending <u>Houston</u> to § 1983 actions filed by <u>pro</u> <u>se</u> prisoners).  In this instance, the exact filing date need not be determined because the dates that are connected to the named Defendants range from March 5, 2014, to April 8, 2014, not near the time of the filing of the

8

Complaint in January, 2015.  (Doc. 1 at 7).  That is, Defendant Dr. Stone interacted with May on March 5, 2014 and near March 27, 2104; Defendant Andrews, on April 8, 2014; and Defendant Hetzel, on March 27, 2014.  (Id. at 5-7).

However, no allegations are present in the Complaint showing that at the time the Complaint was filed in January, 2015 that May was in imminent danger of a serious physical injury as a result of any of the Defendants' actions or inactions.  See Zatler v. Wainwright, 802 F.2d 397, 401 (11th Cir. 1986) (finding that a plaintiff must establish a causal connection between a defendant's actions, orders, customs, or policies and a deprivation of the plaintiff's constitutional rights in order to state a claim upon which relief may be granted in a § 1983 action); cf. Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949, (2009) (holding that "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face") (citation omitted).  May complains about Defendants' actions or inactions that occurred in the past, not near the time of the Complaint's filing.  Even though this deficiency controls the disposition of this action, the court does recognize that May's underlying hydrocephalus and the condition of his VP shunt have been determined previously to be a serious medical need.  See

May v. Patterson, CA No. 11-675-KD-B (S.D. Ala.)[2] (unpublished) (recognizing Plaintiff's serious medical need), appeal dismissed

---

[2]    In May v. Patterson, CA No. 11-675-KD-B, the medical Defendants furnished a copy of May's medical records with their Special Report.  (Doc. 32).  These records show that on July 12, 2010, Dr. Eugene Quindlen, a neurosurgeon at the University of South Alabama ("USA"), examined May for increased headaches and ataxia.  (Doc. 32-3 at 19).  He noted May's history of having a VP shunt placed in his brain in 1990 for hydrocephalus and of having a resection of two AVMs in his brain in 1991 and 1992 by Dr. Wink Fisher at UAB.  (Id.).  Earlier, when Dr. Quindlen saw May in 2008, he could find no particular reason for May's headaches.  (Id.).  He observed that May had a history of a severe stroke, and was taking tegretol for seizures.  (Id.).

The medical records show that on July 12, 2010, May was having severe headaches, dizzy spells, and fatigue (id. at 19); his gait was slightly more stiff than before; and Dr. Quindlen could palpate the shunt, which was noted as being collapsed and not refilling.  (Id. at 20).  His review of the x-rays showed no evidence of edema and no shunt x-rays being performed.  (Id.).  Dr. Quindlen found that May was "healthy appearing and in no apparent distress" and did not think that May had "severe elevated intracranial pressure [, but instead was] having poor shunt function."  (Id.).  His plan was to obtain shunt films and admit May to the hospital for a shunt revision.  (Id.).

Shortly thereafter, on September 15, 2010, pursuant to the warden's request, the prison doctor extensively reviewed May's medical records, noting that May has hydrocephalus with a malfunctioning shunt, which had led to headaches and ataxia.  (Doc. 32-3 at 5).  The warden wanted the doctor to talk to May because he refused to have surgery performed by the neurosurgeon at USA and instead wanted to have his original surgeon at UAB, who had given him the shunt, perform the surgery.  (Id.).  The UAB option was not available.  (Id.).  **Thus, May refused to have the recommended surgery**.  (Id. at 30).

On July 24, 2013, a Report and Recommendation was entered granting Defendants' summary judgment and finding no deliberate indifference to May's serious medical needs.  (Doc. 69).  The extensive medical treatment that May received was recounted. After the District Court adopted the Report and Recommendation

as frivolous (11th Cir. June 26, 2014) (holding that the District Court properly granted summary judgment) (Doc. 94). However, May made no allegations that he was in "imminent danger of serious physical injury" at the time of the Complaint's filing. Accordingly, the undersigned concludes that May's allegations do not demonstrate that he was "under imminent danger of serious physical injury" at the time the Complaint was filed. Brown, 387 F.3d at 1350.

## IV.  Conclusion.

Because May cannot avail himself of § 1915(g)'s exception, and on account of his failure to pay the $400.00 filing fee at the time he filed his Complaint, this action is due to be dismissed without prejudice. Dupree, 284 F.3d at 1236 (holding

---

and entered Judgment for Defendants (Docs. 74, 75), May appealed.

On June 26, 2014, the Eleventh Circuit Court of Appeals found May's appeal to be frivolous. (Doc. 94 at 7). The Eleventh Circuit noted that May's taking issue with Dr. Quindlen's recommendation was the root of the instant action and "cannot sustain a claim of deliberate indifference." (Id.). The Court opined that May had "not identified any evidence to refute or even undermine Dr. Quindlen's medical judgment, or otherwise demonstrate that the Defendant rendered inadequate or delayed medical care. **[Plaintiff] instead has demanded a physician of his own choosing.**" (Id.) (Emphasis added.)

In a later action, May v. Barber, CA No. 14-479-WS-N (S.D. Ala. Feb. 26, 2105), some of May's litigation history surrounding medical issues with his head is again recounted in the Magistrate Judge's Report and Recommendation recommending the dismissal of his action pursuant to 28 U.S.C. § 1915(g). (Doc. 2).

that an action must be dismissed without prejudice when an inmate who is subject to 28 U.S.C. § 1915(g) does not pay the full filing fee at the time he initiates the action); Vanderberg v. Donaldson, 259 F.3d 1321, 1324 (11th Cir.) (holding that the filing fee paid must be paid by an inmate subject to § 1915(g) at the time an action is commenced), cert. denied, 535 U.S. 976 (2002).   Therefore, it is recommended that this action be dismissed without prejudice pursuant to 28 U.S.C. § 1915(g).

## NOTICE OF RIGHT TO FILE OBJECTIONS

A copy of this report and recommendation shall be served on all parties in the manner provided by law.   Any party who objects to this recommendation or anything in it must, within fourteen (14) days of the date of service of this document, file specific written objections with the Clerk of this Court.   See 28 U.S.C. § 636(b)(1); FED.R.CIV.P. 72(b); S.D. ALA. L.R. 72.4. The parties should note that under Eleventh Circuit precedent, "the failure to object limits the scope of [] appellate review to plain error review of the magistrate judge's factual findings."   Dupree v. Warden, 715 F.3d 1295, 1300 (11th Cir. 2013).   In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the Magistrate Judge's report and recommendation where the disputed determination is found.   An objection that merely incorporates

12

by reference or refers to the briefing before the Magistrate

Judge is not specific.

     **DONE** this **17th** day of **April, 2015.**

                                          **/s/ SONJA F. BIVINS**
                                 **UNITED STATES MAGISTRATE JUDGE**